**Robert L. and Dorothy G. MAPLE, Petitioners-Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.**

**William M. and Eleanor A. SMITH, Petitioners-Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.**

**Nos. 24462, 24463.**

United States Court of Appeals, Ninth Circuit.

April 15, 1971.

Byrne, District Judge, dissented and filed opinion.

Gilbert E. Andrews (argued), Atty., Tax Division; Richard M. Hahn, Acting Chief Counsel; Meyer Rothwacks, William A. Friedlander, John S. Stephan, Attys., Dept. of Justice; Johnnie M. Walters, Asst. Atty. Gen., Washington, D. C., for appellant.

Dean S. Butler (argued), Don M. Pearson (argued), of Willis, Butler & Scheifly, Los Angeles, Cal., for appellees.

Before MERRILL and HUFSTED-LER, Circuit Judges, and BYRNE,* District Judge.

HUFSTEDLER, Circuit Judge:

The Commissioner of Internal Revenue appeals from a decision of the Tax Court allowing taxpayers Robert Maple and William Smith[1] to deduct as business expenses certain amounts incurred or expended in connection with the development of an orchard.

The taxpayers were limited partners in the Maple Corona Ranch Company ("Corona"), a partnership organized to develop and operate a citrus orchard. In June of 1961, Corona entered into an agreement with M & M Company ("M&M"), a nursery, whereby Corona purchased 26,000 seedlings at $.30 apiece from M&M and M&M agreed to maintain, cultivate, and bud the seedlings in its nursery for $2.45 per tree. The risk of loss due to causes other than the poor workmanship of M&M was upon the seedlings' owner, Corona. The taxpayers deducted the full cost of their maintenance contract as a business expense in 1961. The Commissioner assessed deficiencies against them, asserting that the costs of the contract should be capitalized. The Tax Court found that only about half of the cost was incurred in 1961 and held that the costs of budding were capital expenditures because a citrus seedling will never become a producer of edible fruits until a bud from a producing plant is grafted onto it. The Tax Court allowed the remainder of the deductions (Robert L. Maple [Memo 1968-194 (Aug. 29, 1968)] T.C.), and the Commissioner has appealed.

It is not the normal practice in the citrus farming industry for the grower to purchase his trees as seedlings and to undertake the risk of raising them into mature trees. A shortage of suitable seedlings in the area enabled M&M to dictate these unusual terms to Corona.

The grower usually purchases his trees ready for the orchard and must, of course, capitalize their full cost.

The Commissioner argues that Maple and Smith cannot convert a capital expense to a business expense by changing the form of the transaction. Expenses incurred prior to production are capital in nature if they are necessary to make productive the item involved. The Commissioner suggests that if a man wishes to produce shoes, he can buy a shoe factory or he can build one. The cost of getting ready to begin the manufacture of shoes, however, must be capitalized whether that cost is embodied in the expense of building a factory or in the price paid for one that is already built.

■ The Commissioner is right about shoemakers. But shoemakers and farmers are not treated in parallel ways by the code and by the regulations. The costs of developing orchards, farms, or ranches, even prior to the time when they are productive, may often be deducted rather than capitalized, even though analogous developmental costs in other industries would have to be capitalized. (*See* Income Tax Regulations § 1.162–12; Estate of Richard R. Wilbur (1964) 43 T.C. 322.) In the field of agriculture the manner in which the expense was incurred will often determine whether it is a capital expenditure or a business expense. If a dairy farmer buys his cows fully mature, he must capitalize their purchase price; if he buys them as calves, he may deduct the cost of raising them to maturity, even though that expense is as much a cost of obtaining an income-producing business as is the purchase of the mature cows. We must analyze the precise path the taxpayer-farmer actually took and we must ask whether the expense in question was purely capital in nature or fell within what the Tax Court has termed the "band of grey" between capital and business expenses that exists only in agricul-

---

* Hon. William M. Byrne, United States District Court Judge for the Central District of California, sitting by designation.

[1]. Taxpayers' wives are a party to this action solely because joint returns were filed.

ture. (Estate of Richard R. Wilbur, *supra* at 328.)

The band of grey exists because many of the costs of running a producing farm are identical to the costs of creating a producing farm. A farmer feeds his mature cows to obtain continued milk production; he gives the same feed to his calves to bring them to maturity. A strictly logical distinction can, of course, be drawn between these two expenditures based upon difference in their purposes, but the tax law does not distinguish them. Expenses of maintaining agricultural items in the preproductive state are deductible if they are sufficiently similar to the expenses that will be required to maintain them once they are productive. (*See* Estate of Richard R. Wilbur, *supra.*) At the times relevant to this case, the Commissioner had categorized such expenses in Mim. 6030, 1946–2 Cum.Bull. 45.[2] Section 1.162–12 of the Income Tax Regulations allows farmers to capitalize business expenses incurred in the preproductive period, but not to deduct capital expenditures. Mim. 6030 defined those expenditures which were not purely capital and hence gave the farmer an option as to treatment. In dealing with orchards, Mim. 6030 stated:

"Expenditures incurred during the development period which represent ordinary and necessary expense items as an incident of current operations, such as the upkeep of a grove or orchard, taxes, water for irrigation purposes, and cultivating and spraying of trees may, under the provisions of [the predecessor of § 1.162–12] be either capitalized or deducted at the election of the taxpayer. * * *"

The expenses in issue were incurred in watering and cultivating Corona's citrus trees. They are precisely the sort of expenditures envisaged by Mim. 6030 as being deductible at the option of the grower.[3]

■■ The Commissioner argues that, even if the cost of such cultivation would be deductible if the cultivation were done by the taxpayer himself on his own land, the costs incurred in this case are not deductible because the work was done by a nursery on its land. We can find no justification for that distinction. Whether or not one is a farmer for tax purposes does not depend on his tilling the soil by his own labor rather than by that of hired hands, tenant farmers, or even professional nurserymen. Where, as here, the taxpayers assume the risk that the crop will never be harvested due to unforeseen circumstances and the crop is related to the taxpayers' farming endeavors, the expenses they incur with regard to that crop are farming expenses. (*Cf.* Income Tax Reg. §§ 1.61–4(d), 1.182–2, 1.175–3.) Our taxpayers bore that risk and are just as entitled to the tax benefits afforded farmers as if they had raised the trees with their own hands.

The judgment is affirmed.

BYRNE, District Judge:

I respectfully dissent:

The majority sustains the Tax Court judgment on the ground that the government has exempted farmers from the rules and regulations which are so onerous to the rest of the nation's taxpayers. The taxpayers involved here are corporate executives who operate an orange grove in their spare time.

The thrust of the majority's opinion is that farmers have the option to treat *all* expenditures, made prior to reaching the productive state, as either deductions or capital expenditures. This position is

2. The Commissioner declared Mim. 6030 obsolete and not considered determinative for future transactions in Rev.Rul. 67–123, 1967–1 Cum.Bull. 383. Mim. 6030 was in effect, however, at all times relevant to this case.

3. We are further persuaded that this conclusion is correct by the fact that Congress recently enacted § 278, requiring capitalization of expenses incurred in the first four years of developing a citrus grove. Were these sorts of expenses not deductible under the present law, there would have been little need for Congress to enact this section.

imbedded in the following Treasury regulation which reads in pertinent part:

"Amounts expended in the development of farms, orchards, and ranches prior to the time when the productive state is reached may be regarded as investments of capital." Treas.Reg. § 1.-162–12.

The belief that this regulation gives a farmer an unlimited option in determining the tax consequences of his expenditures has been rejected. In Thompson & Folger Co. v. Commissioner of Internal Revenue, 17 T.C. 722, 725–726, the court held that this regulation *only* permits a taxpayer *to capitalize a deductible business expense:*

"The reasonable interpretation, and the one which in our view meets the test of simple logic, is that the provision *was designed to allow a farmer to capitalize,* rather than expense and deduct, expenditures made in the years prior to the bringing of the farm to a productive state, which expenditures were of such a character that in the course of regular farming operations they would be regarded as operating expenses and therefore currently deductible—To construe the regulation as providing the converse, that is, that the farmer was privileged at his option to expense and deduct capital items, would require us to re-write and expand the regulation."

(Emphasis supplied).

The expenditures [1] which taxpayers seek to deduct were all *incurred by the nursery (M&M)*—not the taxpayers. An accountant called as a witness by the taxpayers, when asked if Corona incurred any expense for balling or budding, replied "No, they contracted X number of dollars to handle the entire cultural care of the tree and have it set roadside". The testimony established that the standard or going price for transplantable orange trees had been a constant $2.75 for the past ten years. This is precisely the end result of the unusual agreement between the nursery and the taxpayers who agreed to pay 30 cents per seedling plus $2.45 per tree for cultural services. In reality the taxpayers were purchasing transplantable orange trees for $2.75 per tree.

The one case cited as authority by the majority is clearly distinguishable. In the Estate of Richard Wilbur, 43 T.C. 332, the taxpayer, who was engaged in farming on a large scale, *planted his fruit tree*s and *then* expended large amounts of money for irrigation, cultivation, pruning, fertilizing, spraying "and other care of the trees which have not yet reached the productive state". The Tax Court stated:

"To be sure, once an orchard has come into production, expenditures for irrigation, pruning, fertilizing, etc., are ordinary and necessary business expenses; they are a charge against current income and must be taken as deductions. But the *situation is* far less clear prior to the time that an orchard has reached the productive state. The expenditures prior to that time may be considered in every real sense as part of and directly related to the cost of acquiring a producing orchard, and as such have the characteristics of capital outlays. It is thus apparent that expenditures which upon superficial analysis may appear to be merely business expenses actually have strong characteristics of both capital outlays and business expenditures. It is not a choice between black or white. Rather, these expenditures fall in a band of gray between black and white, and we think that the Regulations giving the farmer an election to treat such expenditures either way was well within the authority of the Secretary of the Treasury under the Statute."

The questionable propriety of applying *Wilbur* to the instant case is readily apparent. In *Wilbur* the actual planting of the *transplantable trees* in the orchards

---

1. Among the specific services the nursery agreed to perform were the following: furnish labor, equipment, water, fertilizer, insecticides, budding and lopping, balling, spraying and weeding.

antedated the taxpayer's expenditures for "cultural practices". Here, the money expended for such practices *preceded the actual planting of the trees*. It even preceded the time the transplantable orange trees came into existence. Also, unlike the situation in *Wilbur,* the instant case is concerned with the taxpayers contracting separately to purchase seedlings and to secure "tree-care services" to convert the seedlings to transplantable orange trees. In *Wilbur,* the taxpayer expended funds to develop his capital assets. Here, the taxpayers contracted to acquire these assets.

If our taxpayers were seeking to deduct as business expense, expenditures for irrigation, etc., during the approximately four years *between the planting of transplantable trees and the production state,* they would fall within what the Tax Court has termed the "band of gray", but as pointed out above the transplantable tree is the capital asset, the cost of which they seek to deduct as a business expense.

As an example to illustrate its point, the majority says a farmer may deduct the cost of feeding his calves as they grow to maturity. With this I agree, but it misses the issue involved here. Like the transplantable trees, the calves are capital assets and when the farmer purchases them he must capitalize the cost even though, as stated by the Court, he may deduct the expense of raising them to the productive state.

The court places reliance on the Commissioner's Mim. 6030 (since declared obsolete). Mim. 6030 relates to "the upkeep of a grove or orchard" not to the initial cost of capital assets. In our case there was no grove or orchard requiring "upkeep" at the time of the expenditures in issue. The majority states "The expenses in issue were incurred in watering and cultivating Corona's citrus trees". This is an inaccurate statement as Corona did not have any citrus trees at the time the expenses were incurred. If the court is referring to the 26,000 seedlings, which according to Corona's agreement with the nursery they purchased for 30

cents apiece, the short answer is that they could have been watered and cultivated for 100 years and they would not have become orange or citrus trees.

An orange tree grows from a bud inserted in the trunk of the seedling. Subsequently all of the seedling, except the roots is cut off and disposed of. When it has progressed sufficiently, it is dug up, balled and transplanted in an orchard. It is only then that you have "a grove or orchard". It is the upkeep of such "a grove or orchard" which is mentioned in Mim. 6030. The approximately three or four years before it reaches the productive state is "the development period" referred to in Mim. 30.

This court in agreement with the Tax Court, places considerable reliance upon the provision in the contract that risk of loss due to hazards beyond the control of M & M was to be borne by the taxpayers. The plain and simple explanation for this is that it was not necessary for Corona to go through the form of assuming paper ownership of the seedlings in order to assume the risk of loss from natural causes.

As the Commissioner points out the same result could have been achieved very simply by having Corona agree to pay $2.75 (the amount the transplantable trees cost Corona) for each of the given lot of 26,000 trees which M & M later delivered at the three year old transplantable stage except those which had failed to reach a given size and condition as a result of causes *within the control of M & M* (i. e., other than natural causes). Had the taxpayers and the nursery bargained in this fashion, and several trees were lost for reasons beyond the control of the nursery, could anyone reasonably contend the capital outlay was thus transformed into a deductible expenditure.

Testimony at the trial revealed that M & M sold transplantable trees to other farmers, including a large block to Irvine Ranch, for $2.75. Those transactions did not involve assumption of risk conditions. The assumption of risk was merely a part

of price bargaining. How could it change a capital outlay into a deductible business expense?

Assuming some trees were lost from natural causes which resulted in Corona's cost of transplantable trees being increased from a net of $2.75 to a net of $2.80 or $2.85. Should the taxpayers not be required to capitalize this cost the same as his neighbor who purchased his trees from M & M for $2.75?

It is not even contended that Corona would ever have considered accepting anything other than the three year old transplantable trees. The formalistic paper change of ownership was without reality. It was not necessary to accomplish the assumption of risk or for any other reason except to sustain the hope of success in attaining the tax benefit sought here.

I would reverse.